IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

NORFOLK DIVISION

FILED
IN OPEN COURT

DEC - 1 2015

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 2:15cr141 |
| | ) | |
| BOBBIE HILLMAN, | ) | |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF FACTS

The parties stipulate that the allegations in the Criminal Information and the following facts are true and correct, and that had the matter gone to trial, the United States would have proven them beyond a reasonable doubt:

## INTRODUCTION

1. BOBBIE HILLMAN was the President of Commonwealth Title & Abstract – a title company located at 4560 South Boulevard, Suite 303, Virginia Beach, Virginia 23452. HILLMAN operated Commonwealth Title which served as the settlement agent on numerous real estate closings.

2. Commonwealth Title & Abstract maintained an escrow account at Monarch Bank. HILLMAN was an authorized signer on the account, and typically was responsible for the distribution of monies after real estate closings.

3. Benjamin Julian owned and operated Julian Properties, LLC – a real estate company that also assisted in completing short sales. HILLMAN met Julian at church.

4. Julian introduced HILLMAN to Jared Williams. Williams worked with Julian Properties to facilitate short sales.



5. Short sale was a term used for a transaction requested by a homeowner allowing the sale of property for an amount less than what was owed to the mortgage lender.

6. At all relevant times, PNC Bank, RBC Bank, Wells Fargo Bank, Bank of America, and Wachovia Bank were insured depository institutions as defined by the Federal Deposit Insurance Act. America's Servicing Company was a division of Wells Fargo Home Mortgage, a division of Wells Fargo Bank. BAC Home Loans was a division of Bank of America.

## THE CONSPIRACY

7. From in or about March, 2008 through in or about January, 2011, within the Eastern District of Virginia and elsewhere, the defendant BOBBIE HILLMAN knowingly and willfully did combine, conspire, confederate and agree with Benjamin Julian, Jared Williams, and others known and unknown, to commit offenses against the United States, namely, bank fraud, that is: having knowingly executed or attempted to execute a scheme and artifice to defraud a financial institution, and to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, and under the custody or control, of a financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

## THE PURPOSE OF THE CONSPIRACY

8. It was the purpose of the conspiracy to defraud mortgage lenders by fraudulently inducing them to accept short sales for various properties.

## THE MANNER AND MEANS OF THE CONSPIRACY

9. Jared Williams served as the short sale negotiator in real estate short sale transactions.



10. In the short-sale transaction, Williams negotiated with a mortgage lender and convinced the lender to accept a short-sale price that was less than what was owed on a current mortgage. The documents sent to the mortgage lender named Julian Properties as the purported buyer of the property. At the same time, Julian, Williams, and others, located a buyer for the home who was willing to pay a purchase price in excess of the short-sale price.

11. All of the fraudulent short sale transactions were closed at HILLMAN's company, Commonwealth Title & Abstract. As part of the conspiracy, defendant BOBBIE HILLMAN executed fraudulent documents on behalf of the seller as the seller's attorney-in-fact. HILLMAN, Julian, Williams and others executed false documents, including false HUD-1 settlement statements purporting to document the sale of the property for the negotiated short sale price. BOBBIE HILLMAN then sent the false HUD-1 to the mortgage lender as proof that the transaction occurred for the short sale price.

12. That same day, HILLMAN, Julian, Williams, and others, then executed a real HUD-1 settlement statement for the actual purchase price. The conspirators did not send the real HUD-1 to the mortgage lender. After the transaction closed, HILLMAN wired an amount equal to the proceeds arising from the false short-sale price via interstate wire to the mortgage lender. HILLMAN then wired the fraud proceeds from the sale to Julian Properties. After receiving the fraud proceeds, Julian retained a portion of the proceeds and wrote a check to Williams for his share of the deal. HILLMAN did not receive a portion of the fraudulent proceeds.



## OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

### A. Wittington Drive

13. On or about August 31, 2009, R.P. and S.P. executed an authorization to allow Wells Fargo and Bank of America to release information to Williams to negotiate a short sale for their home located on Wittington Drive in Chesapeake.

14. On or about November 10, 2009, Williams forwarded a proposed HUD-1 short sale to Bank of America to negotiate the short sale. The HUD-1 reflected a proposed short sale from R.P. and S.P. to Julian Properties. On or about December 22, 2009, Bank of America agreed to accept proceeds from the proposed short sale as payoff of its mortgage loan.

15. On or about January 4, 2010, HILLMAN prepared a false HUD-1 showing a sale for $166,000.00. The HUD-1 does not reflect any money going to Julian Properties, LLC; instead, it showed Julian Properties paying $164,773.82 cash at closing. This transaction never occurred. Julian executed this false HUD on behalf of Julian Properties. HILLMAN executed the false HUD on behalf of R.P. and S.P. as seller's attorney-in-fact knowing full well that this transaction did not occur. HILLMAN nevertheless forwarded this false HUD-1 to Bank of America as documentation of the transaction.

16. That same day, the real closing took place. In this transaction, T.C. and D.C. purchased the property from R.P. and S.P. for $260,000.00. The real HUD-1 purported to reflect a "subordinate lien payoff" in the amount of $95,529.46. HILLMAN was well aware that the amount listed as going to "subordinate lien payoff" actually was going to Julian Properties. HILLMAN again executed this HUD-1 as the seller's attorney-in-fact. HILLMAN never sent this HUD-1 to Bank of America.



17. On or about January 5, 2010, HILLMAN sent a cashier's check in the amount of $16,000.00 – the negotiated short sale price – to Bank of America to pay the second mortgage. On or about January 11, 2010, HILLMAN paid $79,478.96 to Julian Properties. Julian retained half of the fraudulent proceeds. On or about January 13, 2010, Julian wrote a check in the amount of $39,176.98 – representing a portion of these fraudulent proceeds – to Williams. The memo section of the check read "Wittington."

18. R.P. and S.P. were not aware that Julian Properties received the $79,478.96 in funds because the HUD-1 reflected $95,529.46 paying the subordinate lien. Bank of America moved to recover from R.P. and S.P. the deficiency balance on the outstanding second mortgage.

**B.  Windy Leaf Court**

19. On or about January 8, 2008, J.Z. executed a special power of attorney for closing real estate transaction authorizing Wells Fargo to release information to Williams to negotiate a short sale for a home located on Windy Leaf Court, in Virginia Beach, Virginia.

20. On or about January 10, 2008, a known conspirator forwarded a real estate purchase contract to Wells Fargo purporting to show that J.Z. intended to sell the Windy Leaf Court property to Julian Properties, LLC. Julian executed this false purchase contract on behalf of Julian Properties, LLC knowing full well that he did not intend to purchase this property.

21. On or about March 28, 2008, BOBBIE HILLMAN prepared a false HUD-1 showing a sale for $281,800.00. The HUD-1 does not reflect any money going to Julian Properties, LLC; instead, it showed Julian Properties paying $283,711.00 cash at closing. This transaction never occurred, but HILLMAN forwarded this false HUD-1 to Wells Fargo as documentation of the transaction. HILLMAN also forwarded to Wells Fargo a HUD-1 Certification certifying that it was a "true and accurate account of this transaction."

5



22. That same day, the real closing took place. In this transaction, S.P. purchased the property from J.Z. for $342,500.00 purchase price. The real HUD-1 reflected the short-sale pay-off to Wells Fargo and included a $45,199.18 fee going to Julian Properties. HILLMAN did not send this HUD-1 to Wells Fargo.

23. On or about March 31, 2008, HILLMAN sent a check in the amount of $272,487.00 – the negotiated short sale proceeds – to Wells Fargo. The same day, HILLMAN paid $45,199.18 to Julian Properties. Julian received these proceeds, retained a portion for himself and sent the remainder of the fraudulent proceeds to Williams.

### C. Thistle Circle

24. On or about March 4, 2009, J.C. and J.C. executed an authorization to allow Wells Fargo to release information to Williams to negotiate a short sale for their home located on Thistle Circle in Virginia Beach.

25. On or about September 10, 2009, Williams forwarded a real estate purchase contract to Wells Fargo purporting to show that J.C. and J.C. intended to sell the Thistle Circle property to Julian Properties, LLC. Julian executed this contract on behalf of Julian Properties knowing full well that he did not intend to purchase this property. On or about January 21, 2010, Julian and other known conspirators executed an affidavit of "arm's length transaction" attesting to the fact that "[n]one of the parties shall receive any proceeds from this transaction except the sales commission." Relying on these misrepresentations, Wells Fargo approved the short sale agreeing to accept less than it was owed for payoff of its mortgage loan.

26. On or about April 5, 2010, HILLMAN prepared a false HUD-1 showing a sale for $144,000.00. The HUD-1 does not reflect any money going to Julian Properties, LLC; instead, it showed Julian Properties paying $139,852.61 cash at closing. JULIAN executed this false HUD-



1 on behalf of Julian Properties. HILLMAN executed the false HUD on behalf of J.C. and J.C. as seller's attorney-in-fact knowing full well that this transaction did not occur. However, HILLMAN forwarded this false HUD-1 to Wells Fargo as documentation of the transaction.

27. That same day, the real closing took place. In this transaction, T.B., D.B. and B.C. purchased the property from J.C. and J.C. for $151,000.00 purchase price. The real HUD-1 reflected the short-sale pay-off to Wells Fargo and included an "Intermediary Fee" to Julian Properties in the amount of $6,499.53. HILLMAN did not send this HUD-1 to Wells Fargo.

28. On or about April 6, 2010, HILLMAN wired $129,930.88 – the negotiated short sale proceeds – to Wells Fargo. On or about April 13, 2010, HILLMAN paid $6,754.53 to Julian Properties. Julian retained a portion of these fraud proceeds. On or about April 16, 2010, Julian wrote a check in the amount of $2,474.76 – representing a portion of these fraudulent proceeds – to Williams. The memo section of the check read, "Thistle Circle."

### D. Leonard Road

29. On or about June 22, 2009, R.S. executed an authorization to allow America's Servicing Company to release information to Williams to negotiate a short sale for a home located on Leonard Road in Portsmouth, Virginia

30. On or about November 16, 2009, Williams forwarded a real estate purchase contract to America's Servicing Company purporting to show that R.S. intended to sell the Leonard Road property to Julian Properties, LLC. Julian executed this contract on behalf of Julian Properties, LLC knowing full well that he did not intend to purchase this property. On or about November 27, 2009, America's Servicing Company approved the short sale, but provided that "the Buyer(s) and Seller(s) cannot be added, removed, changed or substituted without prior written approval" and instructed the closing agent to "immediately notify the lender if the closing

7



agent had "any knowledge of any sale or transfer of the property within 30 days of this transaction."

31. On or about January 4, 2010, HILLMAN prepared a false HUD-1 showing a sale for $142,000.00. The HUD-1 does not reflect any money going to Julian Properties, LLC; instead, it showed Julian Properties paying $141,027.33 cash at closing. Julian executed the false HUD-1 on behalf of Julian Properties. HILLMAN executed the false HUD on behalf of R.S. as seller's attorney-in-fact knowing full well that this transaction did not occur. HILLMAN forwarded this false HUD-1 to America's Servicing Company as documentation of the transaction.

32. That same day, the real closing took place. In this transaction, E.S. and L.S. purchased the property from R.S. for $160,000.00 purchase price. The real HUD-1 reflected the short-sale pay-off to America's Servicing Company and included a $12,241.56 fee going to Julian Properties. HILLMAN did not send this HUD-1 to Wells Fargo.

33. On or about January 7, 2010, HILLMAN wired $132,000.66 – the negotiated short sale proceeds – to America's Servicing Company. On or about January 7, 2010, HILLMAN wired $12,166.56 to Julian Properties. Julian retained a portion of the fraud proceeds. On or about January 21, 2010, Julian wrote a check in the amount of $6,120.78 – representing a portion of these fraudulent proceeds – to Williams. The memo section of the check read, "Leonard."

E. **East Freemason Street**

34. On or about December 28, 2008, R.S. executed an authorization to allow Wells Fargo to release information to Williams to negotiate a short sale for a home located on East Freemason Street, in Norfolk, Virginia

8



35. On or about July 1, 2009, Williams forwarded a real estate purchase contract to Wells Fargo purporting to show that R.S. intended to sell the East Freemason Street property to Julian Properties, LLC. Julian executed the purchase contract on behalf of Julian Properties, LLC knowing full well that he did not intend to purchase this property. The same day, JULIAN executed an affidavit of "arm's length transaction" attesting to the fact that "[n]one of the parties shall receive any proceeds from this transaction except the sales commission."

36. On or about August 10, 2009, HILLMAN prepared a false HUD-1 showing a sale for $243,000.00. The HUD-1 does not reflect any money going to Julian Properties, LLC; instead, it showed Julian Properties paying $243,687.73 cash at closing. Julian executed this false HUD-1 on behalf of Julian Properties, LLC. HILLMAN executed the false HUD on behalf of R.S. as seller's attorney-in-fact knowing full well that this transaction did not occur. HILLMAN then forwarded this false HUD-1 to Wells Fargo as documentation of the transaction.

37. On August 7, 2009, the real closing took place. In this transaction, N.T. and G.C. purchased the property from R.S. for $257,000.00 purchase price. The real HUD-1 reflected a short-sale pay-off to Wells Fargo and included a $2,550.63 fee going to Julian Properties. HILLMAN did not send this HUD-1 to Wells Fargo.

38. On or about August 10, 2009, HILLMAN sent two checks totaling $228,989.43 - the negotiated short sale proceeds to Wells Fargo. The same day, HILLMAN wired $3,726.54 to Julian Properties. Julian retained a portion of the proceeds, and sent to Williams a portion of these fraudulent proceeds.

F. **Glencoe Lane**

39. On or about November 21, 2009, M.D. and L.D. executed an authorization to allow Countrywide – a corporation whose assets were ultimately purchased by BAC Home

9



Loans - to release information to Williams to negotiate a short sale of their home located on Glencoe Lane in Virginia Beach, Virginia.

40. On or about December 1, 2009, a real estate purchase contract was executed purporting to show that M.D. and L.D. intended to sell the Glencoe Lane property to Julian Properties. JULIAN executed the contract on behalf of Julian Properties, LLC knowing full well that he did not intend to purchase this property. On or about June 17, 2010, BAC Home Loans approved the short sale, agreeing to accept less than it was owed for payoff of its mortgage loan.

41. On or about July 29, 2010, HILLMAN prepared a false HUD-1 showing a sale for $115,000.00. The HUD-1 did not reflect any payment to Julian Properties; instead, it showed Julian Properties paying $113,490.50 cash at closing. Julian executed the fraudulent HUD-1 on behalf of the fraudulent buyer, Julian Properties. HILLMAN executed the false HUD on behalf of M.D. and L.D. as seller's attorney-in-fact knowing full well that this transaction did not occur. HILLMAN then forwarded this false HUD-1 to BAC Home Loans as documentation of the transaction.

42. That same day, the real closing took place. In this transaction, K.C.C. purchased the property from M.D. and L.D. for $127,000.00 purchase price. The real HUD-1 reflected the short-sale pay-off to BAC Home Loans, but did not show any payment to Julian Properties. HILLMAN did not send this HUD-1 to BAC Home Loans.

43. On or about August 2, 2010, HILLMAN wired $104,446.50 – the amount of the negotiated short sale proceeds – to BAC Home Loans. That same day, HILLMAN sent two wires totaling $10,456.93 to Julian Properties. Julian retained a portion of these proceeds. On or about August 9, 2010, Julian wrote a check in the amount of $5,418.90 – representing a portion of these fraudulent proceeds – to Williams.



G.  **Rainbow Drive**

44. On or about September 21, 2009, A.V. executed an authorization to allow Wachovia, to release information to Williams to negotiate a short sale of her home located on Rainbow Drive in Virginia Beach, Virginia.

45. On or about February 24, 2010, Williams forwarded a real estate purchase contract to Wachovia purporting to show that A.V. intended to sell the Rainbow Drive property to Julian Properties, LLC. Julian executed the purchase contract on behalf of Julian Properties knowing full well that he did not intend to purchase this property. On or about March 10, 2010, Wachovia approved the short sale, agreeing to accept less than it was owed for payoff of its mortgage loan.

46. On or about March 22, 2010, a known conspirator prepared a false HUD-1 showing a sale for $158,000.00. The HUD-1 did not reflect any payment to Julian Properties; instead, it showed Julian Properties paying $156,802.47 cash at closing. JULIAN executed the fraudulent HUD-1. HILLMAN executed the false HUD on behalf of A.V. as seller's attorney-in-fact knowing full well that this transaction did not occur. HILLMAN forwarded this false HUD-1 to Wachovia as documentation of the transaction.

47. That same day, the real closing took place. In this transaction, E.K. and G.K. purchased the property from A.V. for $177,625.00 purchase price. The real HUD-1 reflected the short-sale pay-off to Wachovia and included an "Intermediary Fee" to "JCP" in the amount of $12,560.10. HILLMAN did not send this HUD-1 to Wachovia.

48. On or about March 23, 2010, HILLMAN wired $140,491.00 – the amount of the negotiated short sale proceeds – to Wachovia. On or about March 24, 2010, HILLMAN sent two wires totaling $17,598.04 to Julian Properties. Julian retained a portion of the fraudulent



proceeds. On or about March 25, 2010, Julian wrote a check in the amount of $5,624.00 – representing a portion of these fraudulent proceeds – to Williams.

49. As a result of HILLMAN and her conspirators' fraudulent conduct, victim mortgage lenders suffered losses of approximately $531,625.45. HILLMAN transferred all of the proceeds from the fraudulent transactions to Williams and Julian, and did not personally retain a portion of the fraudulent proceeds.

50. The defendant acknowledges that the foregoing statement of facts does not describe all of the defendant's conduct relating to the offenses charged in this case, nor does it identify all of the persons with whom defendant may have engaged in illegal activities.

Dana J. Boente
United States Attorney

By: _____
Melissa E. O'Boyle
Assistant United States Attorney


After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, BOBBIE HILLMAN, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
BOBBIE HILLMAN

I am BOBBIE HILLMAN's attorney. I have carefully reviewed the above Statement of Facts with her. To my knowledge, her decision to stipulate to these facts is an informed and voluntary one.

_____
William B. Parkhurst
Counsel for Defendant
